11 CV 0833

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RECEIVED

FEB 07 2011

U.S.D.C. S.D. N.Y.
COMPLETED

| | |
|---|---|
| WALTER RUBIN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) No. |
| Plaintiff, | ) ) **CLASS ACTION COMPLAINT FOR** |
| v. | ) **VIOLATIONS OF THE FEDERAL** ) **SECURITIES LAWS** |
| CHINA MEDIAEXPRESS HOLDINGS, INC. and ZHENG CHENG, | ) ) ) |
| Defendants. | ) ) **JURY TRIAL DEMAND** |

1

Plaintiff, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by China MediaExpress Holdings, Inc. ("CME," "CCME" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by CME; and (c) review of other publicly available information concerning CME.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a securities class action on behalf of purchasers of CME's securities between November 8, 2010 and February 3, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      CME purports to operate the largest television advertising network on inter-city express buses in China.

3.      On January 31, 2011, analyst firm Citron Research published a report alleging that CME has misrepresented, among other things, the scope of the Company's operations, its financial performance, and the extent of the Company's claimed strategic partnership with a government-affiliated entity. The Citron Research report concluded that the Company "does not exist at the scale that they are reporting to the investing public."

4.      On this news, shares of CME declined $3.02 per share, more than 14%, to close on January 31, 2011, at $17.84 per share.

5.      Three days later, on February 3, 2011, analyst firm Muddy Waters issued a detailed report echoing many of the allegations in the Citron Research report.  Among other

things, the Muddy Waters alleged that CME "is engaging in a massive 'pump and dump' scheme…significantly inflating its revenue and earnings in order to pay management earn-outs and inflate the stock price so insiders can sell."

6.     Following this news, CME shares declined $5.52 per share, or 33.23%, to close on February 3, 2011, at $11.09 per share on unusually heavy volume of more than 21.6 million shares traded.

7.     Throughout the Class Period, Defendants made false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, prospects and performance. Specifically, during the Class Period Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company misrepresented the number of buses in its advertising network; (2) that the Company misrepresented the nature and extent of its business relationships; (3) that, as a result, the Company's financial results were overstated during the Class Period; and (4), as a result of the above, that the Company's statements concerning CME's business, operations, and prospects were materially false and misleading at all relevant times.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.    Venue is proper in this Judicial District pursuant to §28 U.S.C. §1391(b), §27 of the Exchange Act (15 U.S.C. §78aa(c)).

12.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).   Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

13.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14.    Plaintiff Walter Rubin, as set forth in the accompanying certification, incorporated by reference herein, purchased CME securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.    Defendant CME is a Delaware corporation with its principal executive offices situated at Room 2805, Central Plaza, Wanchai, Hong Kong.   The Company, through its operating subsidiary, purports to operate the largest television advertising network on inter-city and airport express buses in China. The Company generates revenue by selling advertisements on a network of television displays installed on express buses originating in eighteen of China's regions, including the four municipalities of Beijing, Shanghai, Tianjin and Chongqing, and fourteen regions including Guangdong, Jiangsu, Jiangxi, Fujian, Sichuan, Hebei, Anhui, Hubei, Shandong, Shanxi, Inner Mongolia, Zhejiang, Hunan and Henan.   CME shares trade on the NASDAQ under the symbol "CCME."

16.     Defendant Zheng Cheng ("Cheng") was, at all relevant times, Chairman, Chief Executive Officer ("CEO") and President of CME.

17.     Defendant Cheng is sometimes referred to hereinafter as the "Individual Defendant." Because of his positions with the Company, defendant Cheng possessed the power and authority to control the contents of CME's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Defendant Cheng was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his positions and access to material non-public information available to him, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Defendant CME purports to operate the largest television advertising network on inter-city and airport express buses in China. The Company claims to generate revenue by selling advertisements on a network of television displays installed on more than 27,200 express buses originating in eighteen of China's most prosperous regions.

19.     The Company's Form 10-K filed with the SEC for the fiscal year ended December 31, 2009, describes CME's business and operations in relevant part as follows:

**Business Summary**
*Overview*
     CME, through contractual arrangements with Fujian Fenzhong, an entity majority owned by CME's majority shareholder, operates the largest television advertising network on inter-city express buses in China. ...

CME's extensive and growing network covers inter-city express bus services originating in China's most prosperous regions. As of December 31, 2009, CME's network covered inter-city express bus services originating in fourteen regions, including the five municipalities of Beijing, Shanghai, Guangzhou, Tianjin and Chongqing and nine economically prosperous provinces, namely Guangdong, Jiangsu, Fujian, Sichuan, Hubei, Anhui, Hebei, Shandong and Shanxi. These fourteen regions in aggregate generated more than half of China's gross domestic product, or GDP, in 2007, according to the National Bureau of Statistics of China. CME's network is capable of reaching a substantial and growing audience. In the first seven months of 2008, a monthly average of 53 million passengers traveled on inter-city express buses within CME's network, representing 57% of all passengers traveling on inter-city express buses installed with television displays in China, according to CTR Market Research. Many of the cities connected in CME's network are major transportation hubs, which serve as points of transfer for large numbers of leisure, business and other travelers in China to other modes of transportation. CME's network also includes airport buses connecting major cities to airports and tour buses traveling on routes that connect major cities with popular tourist destinations in China. As of December 31, 2009, CME's network covered all of the transportation hubs designated by the Ministry of Transport, and CME expects to further increase this percentage as it continues to expand the geographic coverage of its network. In addition to major transportation hubs, the network also covers small to medium-sized cities in China, some of which rely on highway transportation as the primary transportation option for connection outside these cities.

CME has entered into long-term framework agreements with 45 bus operator partners for terms ranging from five to eight years. Pursuant to these agreements, CME pays the bus operators concession fees for the right to install its displays and automated control systems inside their buses and display entertainment content and advertisements. CME's entertainment content is provided by third parties and advertisements provided by its clients. CME obtains a wide range of free entertainment content from Fujian SouthEastern Television Channel and Hunan Satellite Television each month and purchases a limited amount of copyrighted programs from the Audio and Video Publishing House of Fujian Province. As of December 31, 2009, the number of inter-city express buses within CME's network is 20,161.

In October 2007, CME entered into a five-year cooperation agreement with Transport Television and Audio-Video Center, or TTAVC, an entity affiliated with the Ministry of Transport of the People's Republic of China, to be the sole strategic alliance partner in the establishment of a nationwide in-vehicle television system that displays copyrighted programs on buses traveling on highways in China. The cooperation agreement also gave CME exclusive rights to display advertisements on the system. In November 2007, TTAVC issued a notice regarding the facilitation of implementation of the system contemplated under the

cooperation agreement to municipalities, provinces and transportation enterprises in China. CME believes its status as the sole strategic alliance partner designated by TTAVC and the exclusive rights to display advertisements on the system has facilitated its historical expansion and is expected to continue to provide them with a competitive advantage in the future.

CME believes its network is a highly effective advertising medium. The network is capable of reaching audiences on inter-city express buses while they remain in a comfortable and enclosed environment with minimal distraction. The majority of the inter-city express buses within the network are equipped with leather seats and air-conditioning, providing a comfortable environment which makes the audiences more receptive to the content displayed on CME's network. Inter- city travel in China typically takes a number of hours. Audiences are therefore exposed to the content displayed on its advertising platform for a significantly longer period of time than on shorter-distance travel. In addition, CME's patented automated control systems ensure that the programs and advertisements are displayed continuously throughout the journey.

* * *

## Defendants' Materially False and Misleading Statements

20.    The Class Period begins on November 8, 2010. On that day CME issued a press release titled, "China MediaExpress Holdings, Inc. Announces Third Quarter Financial Results." Therein, the Company, in relevant part, stated:

**Third Quarter Revenue and Net Income Increased by 118% and 167%, Respectively**

**Increases 2010 Net Income Guidance to Between $100 Million and $104 Million**

Fujian, China – November 8, 2010 – China MediaExpress Holdings, Inc. (NASDAQ GS: CCME) ("CME" or "Company"), China's largest television advertising operator on inter-city and airport express buses, today announces financial results for the three and nine months ended September 30, 2010.

**Third Quarter 2010 vs. Third Quarter 2009**
*Revenue increased by 118% to $57.0 million as compared to $26.1 million;
*Gross margin was 76.8% as compared to 67.0%;
*Income from operations increased by 166% to $41.2 million as compared to $15.5 million; and,
*Net income increased by 167% to $31.1 million or $0.81 per diluted share as compared to $11.7 million or $0.56 per diluted share.

**Nine Months 2010 vs. Nine Months 2009**
*Revenue increased by 142% to $155.0 million as compared to $64.0 million;
*Gross margin was 72.6% as compared to 64.1%;
*Income from operations increased by 179% to $103.8 million as compared to $37.2 million;
*Net income increased by 184% to $77.8 million or $1.86 per diluted share as compared to $27.4 million or $1.31 per diluted share; and,
*As of September 30, 2010, the Company had approximately $170 million in cash.

Zheng Cheng, CME"s Founder and CEO, commented, "As expected, revenue and net income maintained very strong growth in the third quarter. The growth was primarily attributed to the power from our largest inter-city buses network in China where our advertising time sold, average advertising rates, number of our advertising customers, and a greater proportion of direct sales to agency sales increased substantially compared to last year.

"In addition, embedded advertising continued to generate a significant portion of our revenue as we have packaged and sold it separately to our clients since Q3 2009. The embedded advertising, which is displayed during the broadcasting of the content, has relatively low production cost, generates high margins and accounts for approximately 23% of our revenue for the nine months ended September 30, 2010.

"Furthermore, our year-to-date results reflect the success of our airport express bus business. Since the first launch of this new business line at the beginning of 2010, the advertising packages sold for airport express buses have been at premium prices, because of the demographics of airport express bus travelers, exclusivity for all the buses from the airports and the unique captive environment. As a result, the expansion of this business has generated significant revenue and has produced higher gross margins overall. For the nine months ended September 30, 2010, the revenue generated from airport express buses was approximately $35.1 million, of which approximately $15.0 million was generated in the third quarter. Our network today covers six large and important airports in China: Beijing, Fuzhou, Guangzhou, Qingdao, Changsha and Chongqing."

Mr. Cheng continued, "We continue to grow our bus network through new contracts with bus operators in regions we already serve and by expanding into new regions in this highly fragmented niche market. Since the start of this year, we have grown our network by more than 4,000 express buses and have expanded into five new regions: Zhejiang, Hunan, Jianxi, Henan and Inner Mongolia. We have long-term contracts in place, ranging from three to eight years with 63 bus operators."

Jacky Lam, CME"s Chief Financial Officer stated, "As of September 30, 2010, we had approximately $170 million in cash up from $139 million as of June 30, 2010. Cash generated from operating activities for the first nine months of 2010 was $69.0 million (of which $30.8 million was generated in the third quarter), compared to $29.9 million generated in the same period of 2009. Net cash used in investing activities during the current nine month period was $3.6 million. Our cash resources continue to be sufficient to meet both our short-term and long-term liquidity needs, capital expenditure requirements to achieve our expansion plans, including internal growth initiatives as well as potential acquisitions."

**Increase 2010 Net Income Guidance**

Based on year-to-to-date results and expectations for the fourth quarter, the Company is increasing its 2010 net income guidance which is expected to be in the range of $100 million to $104 million compared to the previous net income guidance of $82 million to $85 million (on a non-GAAP basis, exclusive of non-cash charges for (i) share based compensation in connection with the granting of options under the Company's share incentive plan expected to be adopted later in 2010 and (ii) deemed dividends on outstanding convertible preferred shares).
Mr. Cheng concluded, "As we have mentioned in the past, we are working on several additional opportunities to increase our market share and reinforce our position as one of the leading players in the out-of-home advertising space. Furthermore, mergers and acquisition remain a corporate priority. We are very proud of our achievements and look forward to continued growth during the years ahead."

21.    On November 9, 2010, CME filed its Quarterly Report with the SEC on Form 10-Q for the period ended September 30, 2010.   The Company's Form 10-Q reaffirmed the Company's financial results previously announced on November 8, 2010.

22.    The Company's Form 10-Q also contained a Sarbanes-Oxley required certification, signed by Defendant Cheng, who certified:

1.    I have reviewed this quarterly report on Form 10-Q for the period ended September 30, 2010 of China MediaExpress Holdings, Inc.;

2.    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the

registrant as of, and for, the periods presented in this quarterly report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchanges Act rules 13-a15(f) and 15d-15(f)) for the registrant and have:

    a.     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.     designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors:

    a.     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

23.     Defendants' statements described in ¶¶20-22, above, were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the

Company misrepresented the number of buses in its advertising network; (2) that the Company misrepresented the nature and extent of its business relationships; (3) that, as a result, the Company's financial results were overstated during the Class Period; and (4), as a result of the above, that the Company's statements concerning CME's business, operations, and prospects were materially false and misleading at all relevant times.

**Disclosures at the End of the Class Period**

24.     On January 31, 2011, analyst firm Citron Research published a report alleging that CME has misrepresented, among other things, the scope of the Company's operations, its financial performance, and the extent of the Company's claimed strategic partnership with a government-affiliated entity. The Citron Research report stated, in relevant part, the following:

> **The China Reverse Merger stock that is "Too Good to be True"**
>
> Every investor protection website, from the SEC on down, posts this advice for investors: "If it sounds too good to be true, it is…" Looking back on major frauds like Bernie Madoff, the most common expression of regret from duped investors is framed just this way. Yet the "too good to be true" story is always tempting — especially so for those who haven't been burned yet.
>
> China Media Express (NASDAQ:CCME) operates a very simple business. They claim to be the largest television advertising operator on inter-city buses and airport express buses in China.
>
> Management claims the company has grown faster and produced more cash flow than any other US listed Chinese media company over the last 4 years.   In spite of having spent a mere fraction of what competitors have on infrastructure, CCME has purportedly grown profits from $2M to its recently raised guidance of $85M expected this year, on revenues of **$200 million**.   Over the last 8 quarters, CCME reported generating $95 million of cash flow after all CAPEX and for-cash acquisitions.   If true, this ROI would be one of the highest in the world, and a complete outlier in the Chinese advertising market, generating even more profit than giant Focus Media, and outpacing all of their competition by a landslide, despite their smaller footprint.   There is only one problem: **No One in China Has Ever Heard of Them. It is Citron's opinion that if this company were operating in the United States, the stock would have buckled long-ago over the lack of transparency in its story.**

* * *

> **Does anyone know how to use Google or Baidu?**
>
> If you simply go to Google or Baidu and put in the Chinese names for the three

11

principal public media advertising operators in China, you will find a plethora of local media coverage about them in their native Chinese language. Articles range from new routes, partnerships, and industry information. …

Yet, if you Google or Baidu [CCME] or CCME's operating company, you will see not one article written on their operating business. There is a vacuum of local media coverage of the company. So we are supposed to believe that the most profitable advertising company in China is just unknown to the Chinese people?

## CCME — The Phantom Company

The clearest example of the "phantom" CCME is an 87 page report prepared by Analysis International on the Chinese Outdoor LCD Screen Market for the year 2010. Every major real player in the space is mentioned…not just the top three, but the top ten! And guess who is missing? CCME is not mentioned anywhere in the doc.
http://wenku.baidu.com/view/7a59ad51ad02de80d4d84011.html

Then there was a recent article written in January 2011 about 360 media, the largest live trading platform for outdoor media in China. In it, they discuss all of inter-city bus advertising and again, with no mention of CCME. …
http://news.cnfol.com/110121/101,1587,9211427,00.shtml

This one is from China Business Intelligence, which mentions every player in the space and again…no CCME:
http://chinabizintel.com/industry-updates/public-transport-tv-market-expanding-in-china.html

OK … just one more. This one is from CNTV, China Network Television, which mentions everyone in the "bus media space"….no CCME.
http://english.cntv.cn/english/special/AD/20101221/108457.shtml

So CCME is a black box, a company that does not appear on its industry's radar, beyond their stock symbol. A simple trip to the CCME website does not reveal much, either for investors or potential business partners. If you go try to get a rate card, you get nothing.
http://www.ccme.tv/eng/pns/rate.php

If you try to click on the page that shows Cooperating Bus Operators, you get nothing.
http://www.ccme.tv/gb/news/operators.php

If you click on the link for Business Partners- you get the logos of just two media providers and no advertising agents.
http://www.ccme.tv/eng/about/partners.php

It appears to Citron that CCME's entire website is intended solely to reinforce the real business of CCME — which is pushing the stock. All of this non-disclosure on their site and in filings is in stark contrast to the colorful investor presentations that proclaim clients and partners that we read about in no other places except investor presentations.

* * *

12

**Just One Example of the Numbers that Don't Make Sense**

How can CCME generate three and a half times the revenue per screen of its competitors?   CCME has roughly 55-60K displays; VISN has appx 120,000 screens.   In Q2, 2010. VISN's total revenue was $31 million and CCME generated $53 million from less than half the screens.   Remember that VISN operates bus advertising in major metropolitan areas, compared to CCME, which claims inter-city buses between 2nd and 3rd tier markets.   That is what the company wants investors to believe.

**The Cover-up**

The company's attempted to add some clarity to their story at its recent investor day.   Out of all the people who could have spoken positively about the company, they chose a representative from Shanghai Apollo Culture Corp. …   In reality Apollo is nothing more than a 2 person shop that can barely pay their bills and had annual revenue of $330K RMB (yes $60K US Dollars), as stated in this article below.
http://www.51jms.com/news/137195.htm

The lack of disclosure extends to the last two press releases about the actual business from CCME that announce two sizable contracts, but no counterparties … in typical CCME fashion.

http://www.ccme.tv/eng/ir/press/p101124.pdf
http://www.ccme.tv/eng/ir/press/p110113.pdf

**Debunking The "Alleged" Government Deal.**

In the filings we read that CCME has become the "sole strategic partner for "an entity affiliated with the Ministry of Transport".   In reality the deal is with the (Transport Television Audio Video Center) TTAVC.   This is not an "exclusive with the government", but rather with a Production Company with government affiliation and should have no authority over directing local bus advertising.   Better yet, if you go to the website of TTAVC and look under a list of companies who they work with, CCME is noticeably absent.   Neither can you find CCME operating subsidiary anywhere on the site of the TTAVC.
http://www.jtbtv.com/worktogether.php

Citron notes that CCME has further confused the story for the US Investor to think that they have an exclusive with the Government for inter-city buses.   That is just a lie.   We are not saying there is no deal with this production company, just that it does not appear to be significant enough to be written anywhere except some corporate filings.
http://www.ccme.tv/eng/about/free_installation.pdf

* * *

**They Got the Big Mac, We Got the Big Mick.**

In order to add to the confusion over the story and possibly to further themselves on someone else's reputation, we would like to point out something very odd.   In Chinese, the name of the CCME's operating corp. is "Fujian Focus Media" — Fujian being the province they are domiciled.   Focus Media is the largest and

13

most respected advertising company in China. To make your name so similar would be as if someone were to open a software company in New York and called it "Microsoft New York". This does not seem like behavior of a company that wants to build a brand, but rather a company opting for deception instead of brand-building.

**Conclusion**

In preparing this report, Citron has come across a plethora of information pointing to CCME being a fraud. These include but are not limited to: SAIC documents, Credit Rating Agency Documents, fake awards and accolades, quotes from industry professionals, and more financial analysis than this company even deserves. The purpose of this report was to look at CCME using simple common sense to understand that the company does not exist at the scale that they are reporting to the investing public. We are not saying that they do not operate any buses, but if you believe that the company operations are truly reflected, or even close to their stated financial disclosures, than you must go to Taco Bell for some filet mignon..

25.     On this news, shares of CME declined $3.02 per share, more than 14%, to close on

January 31, 2011, at $17.84 per share.

26.     Three days later, on February 3, 2011, analyst firm Muddy Waters issued a

detailed report titled "CCME: Taking the Short Bus to Profits." The Muddy Waters report echoed

many of the allegations in the Citron Research report published three days earlier. Among other

things, the Muddy Waters report alleged the following:

- "Muddy Waters, LLC believes that CCME is engaging in a massive "pump and dump" scheme whereby it significantly inflates revenue and profits in order to enrich management through earn-outs and stock sales;

- "We estimate that CCME's actual 2009 revenue was no more than $17 million (versus $95.9 million it reported);

- "The data CCME provides to advertisers shows that it has fewer than half of the 27,200 buses it claims to have;

- "The CTR Media Intelligence reports that the Company uses to support its claims contain gross errors that we conclude are due to manipulation by the management;

- "We estimate that over half of CCME's network buses do not actually play CCME content. Rather, drivers play DVD movies that are often provided by passengers;

14

- "We caught CCME's management telling a particularly egregious lie – that its new website (www.switow.com) has entered into an agreement with Apple (or one of Apple's) distributors. Neither is true;

- "CCME's core audience is sub-Greyhound Bus demographic, …which is largely unattractive to all but local businesses;

- "[O]ver half of CCME's network buses do not actually play CCME content. Many of the buses in which CCME installs hard drives and screens also have DVD players connected to the screens. We surveyed over 50 CCME buses, and the majority was playing DVDs instead of CCME content;

- "Approximately 25% of CCME's Network Operator Buses are Independently Owned, and Are Not Covered by Agreements with CCME;

- "According to the bus drivers and operators with whom we spoke, approximately 25% of the buses in a given operator's network are independently owned and operated. These buses are not be covered by agreements between CCME and the operators. The independently owned buses typically do not have CCME equipment. …;

- "We Believe that Over Half of the Buses on which CCME has Placed Screens do not Actually Show CCME's Content, which Makes CCME's Revenue Claims More Outlandish."

27.     Following this news, CME shares declined $5.52 per share, more than 33%, to close on February 3, 2011, at $11.09 per share and unusually heavy volume of more than 21.6 million shares traded.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased CME's securities between November 8, 2010 and February 3, 2011, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CME's securities were actively traded on National Association of Securities Dealers Automated Quotations Market ("NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of CME shares were traded publicly during the Class Period on the NASDAQ and as of December 6, 2010, CME had approximately 36.9 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by CME or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public during the

Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of CME; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

34.     The market for CME's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, CME's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired CME's securities relying upon the integrity of the market price of the Company's securities and market information relating to CME, and have been damaged thereby.

35.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of CME's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about CME's business, operations, and prospects as alleged herein.

17

36.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CME's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

37.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

38.     During the Class Period, Plaintiff and the Class purchased CME's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

39.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding CME, his/her control over, and/or receipt and/or modification of CME's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CME, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

40.     The market for CME's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, CME's securities traded at artificially inflated prices during the Class Period. On January 27, 2011, the price of the Company's common stock reached a Class Period high of $22.81 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of CME's securities and market information relating to CME, and have been damaged thereby.

41.     During the Class Period, the artificial inflation of CME's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CME's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of CME and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class

Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

42.     At all relevant times, the market for CME's securities was an efficient market for the following reasons, among others:

(a)     CME stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, CME filed periodic public reports with the SEC and the NASDAQ;

(c)     CME regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

43.     As a result of the foregoing, the market for CME's securities promptly digested current information regarding CME from all publicly available sources and reflected such information in CME's stock price. Under these circumstances, all purchasers of CME's securities during the Class Period suffered similar injury through their purchase of CME's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

44.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of CME who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

45. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase CME's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

47. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CME's securities in violation of Section 10(b) of the

Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

48.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CME's financial well-being and prospects, as specified herein.

49.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CME's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about CME and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

50.     The Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendant was a high-level executive and director at the Company during the Class Period and member of the Company's management team or had control thereof; (ii) by virtue of his responsibilities and activities as a senior officer and/or director of the Company, the Individual Defendant was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Individual Defendant enjoyed significant personal contact and familiarity with

the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) the Individual Defendant was aware of the Company's dissemination of information to the investing public which he knew and/or recklessly disregarded was materially false and misleading.

51. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CME's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

52. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of CME's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants

during the Class Period, Plaintiff and the other members of the Class acquired CME's securities during the Class Period at artificially high prices and were damaged thereby.

53.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that CME was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their CME securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

54.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

55.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendant**

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     Defendant Cheng acted as a controlling person of CME within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, and his ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendant had the power to influence and

control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.     In particular, The Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

59.     As set forth above, CME and the Individual Defendant each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of his positions as a controlling person, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 7, 2011

**POMERANTZ HAUDEK
   GROSSMAN & GROSS, LLP**

By: _____
            Marc I. Gross
            Jeremy A. Lieberman
100 Park Avenue, 26th Floor
New York, New York  10017-5516
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

Patrick V. Dahlstrom
**POMERANTZ HAUDEK
   GROSSMAN & GROSS, LLP**
One North LaSalle Street, Suite 2225
Chicago, Illinois 60602
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
info@glancylaw.com

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847

*Attorneys for Plaintiff*

26

## SWORN CERTIFICATION OF PLAINTIFF

China MediaExpress Holdings, Inc., **SECURITIES LITIGATION**

I, Walter Rubin, certify that:

1.  I have reviewed the complaint and authorized its filing.

2.  I did not purchase China MediaExpress Holdings, Inc., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in China MediaExpress Holdings, Inc. during the class period set forth in the Complaint are as follows:

I bought _100_, shares on _12_/_16_/_10_ at $ _17_ per share.
I bought _50_ shares on _1_/_27_/_11_ at $ _22.5_ per share.
I bought _40_ shares on _1_/_28_/_11_ at $ _21.2_ per share.
I bought _60_ shares on _2_/_2_/_11_ at $ _16.79_ per share.
I bought _____ shares on ___/___/___ at $ _____ per share.

I sold _60_ shares on _2_/_1_/_11_ at $ _16.4901_ per share.
I sold _____ shares on ___/___/___ at $ _____ per share.
I sold _____ shares on ___/___/___ at $ _____ per share.
I sold _____ shares on ___/___/___ at $ _____ per share.
I sold _____ shares on ___/___/___ at $ _____ per share.

(List Additional Transactions on a Separate Page if Necessary)

5.  I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

____ ☐ Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _2/5/11_

_Walter Rubin_
(Please Sign Your Name Above)